IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN KLAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No: 09-12 |
| v. | ) | |
| | ) | |
| AXA EQUITABLE LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

CONTI, District Judge

## I.     Introduction

Pending before the court is the motion for summary judgment (the "Motion") (Docket

No. 72) filed by defendant AXA Equitable Life Insurance Company ("defendant" or "AXA")

with respect to all claims asserted in the amended complaint against it by plaintiff John Klay

("plaintiff" or "Klay"). The genesis of the amended complaint is that AXA allegedly failed to

pay Klay total disability insurance benefits. The amended complaint includes five counts: 1)

count I - declaratory judgment; 2) count II – breach of contract; 3) count III - violation of the

covenant of good faith and fair dealing; 4) count IV - violation of the unfair claims and

settlement practices act pursuant to 40 Pa. Cons. Stat. §§1171.5 et seq. and 31 Pa. Code

§§146.1 et seq.; and 5) count V - punitive damages. (Docket No. 70.) After reviewing the

Motion, and all other submissions of the parties, AXA's Motion will be granted.

## II.     Procedural Posture

On June 16, 2008, plaintiff initiated the instant action by filing a complaint against AXA

in the Circuit Court of Ohio County, West Virginia. On July 18, 2008, defendant filed a notice

of removal to the United States District Court for the Northern District of West Virginia, pursuant to 28 U.S.C. §§1332, 1441 and 1446.  (Docket No. 3.)  On August 19, 2008, defendant filed a motion to transfer venue to the United States District Court for the Western District of Pennsylvania.  ("Motion to Transfer") (Docket No. 6.)  On January 6, 2009, the Motion to Transfer was granted.  (Docket No. 28.)  On October 19, 2009, plaintiff filed an amended complaint against AXA.  (Docket No. 70.)  On November 23, 2009, defendant filed the Motion and a brief in support (AXA's Brief in Support of Motion for Summary Judgment) (Docket No. 73).  On December 22, 2009, plaintiff filed a response to the Motion.  (Response to Motion for Summary Judgment) (Docket No. 76.)  On January 1, 2010, AXA filed a reply brief (Defendant's Reply Brief) (Docket No. 78.)  On January 20, 2010, AXA filed the Joint Concise Statement of Material Facts, which combined the concise statement of material facts submitted by both parties (the "C.S.F.") (Docket No. 81.)

## III.    Factual Background

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### A.    Disability Policies

Klay was a cardiothoracic[1] and vascular[2] surgeon for over twenty-five years.  (C.S.F. ¶ 68.)  From February 1984 to December 1989, Klay purchased six disability insurance policies,

---

[1]    Cardiothoracic means "relating to, involving, or specializing in the heart and chest." http://www.intelihealth.com/cgi-bin/dictionary (last visited 9/23/2010).

[2]    Vascular  means "pertaining to vessels, . . . having  a copious blood supply."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 2054 (31st ed. 2007).

with residual disability riders, from defendant (the "policies"). (Id. ¶ 1) Robert King ("King"), the sales agent for defendant, sold plaintiff the disability policies along with the residual riders. (Id.¶ 69.) King advised plaintiff that if he could no longer perform his full and complete duties as a cardiothoracic and vascular surgeon, plaintiff would be considered totally disabled. (Id. ¶ 70, J. Klay Dep. Tr. 61-62, Jan. 20, 2009, Pl.'s Concise S.F. at Ex. 2.) (Docket No. 77.)

The policies contain a provision defining the term "total disability" ("total disability"). (Id. ¶ 2, see e.g. Pl.'s Concise S.F. at Ex. 1A-B.)[3] All six of the policies defined "total disability" as:

> **TOTAL DISABILTY** means your inability due to injury or sickness to engage in the substantial and material duties of your regular occupation. It will not be considered to exist for any time you are not under the regular care and attendance of a doctor.

(Id.) Each policy also defined the term "residual disability" ("residual disability"). (Id. ¶ 3, see e.g. Pl.'s Concise S.F. at Exs. 1A-B.)

Five of the policies defined "residual disability" as:

> **RESIDUAL DISABILITY** means your inability due to injury or sickness to perform:
> (1) one or more of the substantial and material duties of your occupation; or
> 2) the substantial and material duties of your occupation for as much time as is usually required to perform them.
> Residual Disability will not be considered to exist for any time you are not under the regular care and attendance of a doctor.

(Id.) The first issued policy defined "residual disability" as: "one or more of the important duties of your occupation"; or "the important duties of your occupation for as much time as is usually required to perform them." (Id.; Def.'s S.F. at Ex. 3B.) (Docket No. 74.) The difference in the language between the first issued policy and the other five policies is the first issued policy used

---

[3]     The record does not include the complete six policies; instead, plaintiff submitted "sample policies," while defendant submitted "excerpts" of the policies. (C.S.F. ¶¶ 1, 2, 3; Pl.'s Concise S.F. at Exs. 1A-B; Def.'s S.F. at Exs. 3A-B.)

the word "important" instead of the words "substantial and material" in the definition of residual disability.  (Id. ¶ 3.)  Residual disability benefits are payable if the insured has a residual disability, as defined in the policy, and experiences a monthly loss earning of at least twenty percent as compared to his predisability monthly earnings.  (Id.)

### B.    Denial of Plaintiff's Application for Life Insurance and Nature of Practice

On July 6, 2006,[4] plaintiff underwent laboratory blood tests in order to apply for life insurance with the United States Life Insurance Company ("U.S.L.I.C.")  (Id. ¶ 15, see lab results at Ex. 4.)  The blood tests were used in 2006 to diagnosis plaintiff with diabetes.  (Id. ¶ 72.)  Plaintiff's son, who does not live or work with plaintiff, testified that he noticed a "degenerative change" in his father's schedule prior to the 2006 diagnosis and that the initial symptoms of the illness manifested themselves years before the diagnosis.  (Id. ¶ 16, C. Klay Dep. 26-27, Jan. 21, 2009, Pl.'s Concise S.F. at Ex. 5.)[5]  On July 21, 2006, U.S.L.I.C. sent plaintiff a letter – which plaintiff received a few days later - informing plaintiff that his application for life insurance was denied based upon laboratory results indicating plaintiff had diabetes, high cholesterol, high triglycerides and hypertension.  (Id. ¶¶ 19-20.)

As of 2005, plaintiff's practice was thirty percent cardiac[6] surgery, thirty percent thoracic[7] surgery and forty percent vascular surgery.  (Id. ¶ 18.)  Upon receipt of the 2006 lab

---

[4]    Defendant submits that this is the date plaintiff actually applied for the life insurance policy with United States Life Insurance Company.

[5]    AXA claims plaintiff gradually reduced his willingness to work long hours years before July 2006.  (C.S.F. ¶ 16.)  In 2004, plaintiff created a "risk management policy" for submission to his medical malpractice insurance carriers.  (Id. ¶ 17.)  For the purpose of obtaining such insurance, plaintiff conveyed his disinterest in being referred trauma patients, or emergency room cases with high risk patients that were unknown to plaintiff.  (Id. Elias Edward Joseph Dep. Tr. 27, May 1, 2009, Pl.'s Concise S.F. at Ex. 6.)

[6]    Cardiac means "pertaining to the heart."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 298 (31st ed. 2007).

results plaintiff did not immediately change his routine practice. (Id. ¶ 21.) Plaintiff continued to perform the same duties that he had been performing as a cardiothoracic and vascular surgeon between the date blood was drawn on July 6, 2006, and the receipt of the insurance denial shortly after July 21, 2006. (Id. ¶ 22.) In the months following July 2006, plaintiff continued to perform some of his duties as a cardiothoracic and vascular surgeon. (Id. ¶ 23.) Upon advice of his physician, he began to reduce the level of his practice by gradually transitioning out of complex cases in consideration of the duties plaintiff owed to his existing patients. (Id.) Complex cases included, among other things, cases: 1) involving a prolonged time in the operating room in which plaintiff could not take a break to eat, drink, check his blood sugar, take medication or use the bathroom and requiring him to stand for long periods of time and to work evening hours to adjust his patients' care; 2) presenting complications after surgery requiring plaintiff to return to the operating room; 3) involving complicated emergency room care requiring nighttime care or surgeries; and 4) requiring numerous follow-up appointments. (Id.)

### C. Plaintiff's Medical History and Treatment

Plaintiff was not diagnosed with diabetes prior to July 2006, but he suspected something was wrong once he began experiencing symptoms such as intractable thirst and extreme fatigue. (Id. ¶ 72.) Plaintiff sent the July 2006 lab results to Sara Kay Wetzel-Saffle, D.O. ("Dr. Wetzel-Saffle"), his treating physician and a designated expert witness. (Id. ¶ 24.) Dr. Wetzel-Saffle received the lab results on August 17, 2006. (Id.) In August 2006, plaintiff conversed with Dr. Wetzel-Saffle about seeking treatment.[8] (Id. ¶ 73, Wetzel-Saffle Dep. Tr. 17, 26, 29-30, Feb. 6, 2009, Pl.'s Concise S.F. at Ex. 8.) Plaintiff's first visit to Dr. Wetzel-Saffle's office occurred on

---

[7]   Thoracic means "pertaining to or affecting the thorax (chest)." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 2054 (31st ed. 2007).

[8]   Defendant claims plaintiff actually sought treatment from Dr. Wetzel-Saffle in August 2006.

October 19, 2006.  (Id. ¶ 26.)  Plaintiff's next in person contact with Dr. Wetzel-Saffle did not occur until plaintiff's hospitalization in April 2007.  (Id. ¶ 27.)

On April 16, 2007, plaintiff began to experience leg pain at work and went to the emergency room.  (Id. ¶ 74.) During the visit to the emergency room, plaintiff learned he was suffering from deep vein thrombosis.  (Id.)  On April 17, 2007, plaintiff returned to the emergency room with acute shortness of breath and was admitted after being diagnosed with an acute pulmonary embolism.  While hospitalized, plaintiff had an intervena cava filter surgically placed in his vein to catch future clots.  (Id.)  Following plaintiff's visit to the hospital, Dr. Wetzel-Saffle became aware that plaintiff was ill, and questioned if plaintiff could perform long hours of surgery out of concern he was at risk of going into a diabetic coma while conducting surgery.  (Id. ¶ 75.)  Dr. Wetzel-Saffle advised plaintiff to reduce his workload.  Although Dr. Wetzel-Saffle did not tell plaintiff to limit his work schedule to two hours maximum per surgery, she believed plaintiff could perform three two-hour long surgeries a day, with an hour break in between each surgery to check his blood sugar and to rest.  (Id. ¶ 30.)

Plaintiff  testified that following a near death hospitalization in April 2007, he knew he was "in deep trouble" and "that in truth [he] had been totally disabled by the way Bob King described it to [him] back when [he] was  first diagnosed" and "probably should have filed his claim back then."  (Id. ¶ 31, J. Klay Dep. Tr. 241-42, Pl.'s Concise S.F. at Ex 2.)  Since April 2007, plaintiff has been an insulin-dependent diabetic, taking up to eight injections a day, and continues to experience progressive fatigue, bilateral foot pain, and decreased sensation in his feet associated with the neuropathy and venus claudication of his legs.  (Id. ¶¶ 77-78.)  In order to have control of his diabetic condition, it is important for Klay to maintain a regular eating schedule, which is difficult with a surgical schedule.  (Id. ¶ 80, Glorioso Dep. Tr. 29, Pl.'s

Concise S.F. at Ex. 7.)  As a result of his medical condition, plaintiff cannot respond to the prolonged hourly demands of patient care and management, stand for extended periods of time, take necessary medications at proper times during long work hours, eat on a regular basis due to prolonged work hours, and "carry out work as a cardiothoracic and vascular surgeon on a 24-hour/seven-day-a-week work schedule as a solo practitioner." (Id. ¶ 79, J. Klay Dep. Tr.  170.)

Since plaintiff's first hospitalization in August 2007, he suffered from diabetic complications, including: neuropathy; trigger fingers - where one's fingers lockup - ; Reynaud's Syndrome - a vascular disease of the distal extremities of the fingers, making one's hands intolerable to cold and resulting in decreased blood circulation to the fingertips and loss of sensation, which is particularly cumbersome to a cardiac surgeon as open heart surgeries require a surgeon to have his hands in ice water with the heart; stasis ulcers or ulcerations on his legs which plaintiff's physician advised will not improve, and might worsen, if he continues to stand for long periods of time; and aggravated supra ventricular achycardia or paroxysmal atrial tachycardia - a condition that may cause interruption of blood flow to the brain.[9]  (Id. ¶ 76.)


After AXA stopped selling disability insurance policies, it transferred its claims adjustment duties to a third-party administrator, Disability Management Services, Inc. ("DMS"). (Id. ¶ 90.)  Plaintiff completed a claimant's statement ("Claimant Statement"), dated July 23, 2007, and sent it to DMS.  (Id. ¶ 33, see AXA Equitable Life Insurance Company's Statement of Facts ("Def.'s S.F.") at Ex. 6) (Docket No. 74-12.)  In the Claimant Statement plaintiff reported that he was partially disabled from July 6, 2006; was totally disabled between April 17, 2007 and

---

[9]     Plaintiff was first diagnosed with diabetic neuropathy in December 2007, trigger fingers in March 2009, Reynaud's Syndrome in November 2007,  and stasis ulcers in July 2009.  (C.S.F. ¶ 76.) (Wetzel-Saffle Dep. Tr. 67-70, 82-83; Glorioso Dep. Tr. 22-23, 35, 41-42.)

May 3, 2007; was still working as a cardiothoracic and vascular surgeon; his monthly earned income prior to becoming disabled was $24,666.67; and his current monthly income at that time was $15,333.33. (Id. ¶ 34.) On the Claimant Statement plaintiff included information from an "Attending Physician's Statement" ("APS") signed by Dr. Wetzel-Saffle on July 24, 2007, noting that plaintiff was totally disabled between April 17, 2007 and May 3, 2007, and he was partially disabled from July 6, 2006 through the date of that APS. (Id. ¶ 35.) On September 13, 2007, Dr. Wetzel-Saffle signed another APS noting that she believed plaintiff, as of August 23, 2007, could perform some of the substantial and material duties of a cardiothoracic and vascular surgeon and that plaintiff was continuing to perform such duties. (Id. ¶ 36.) When Dr. Wetzel-Saffle retired in March 2009, Dr. Joseph J. Glorioso ("Dr. Glorioso") became plaintiff's treating doctor. (Id. ¶ 82.)

Based upon plaintiff's treatment records from 2006 to the beginning of August 2009, Dr. Glorioso testified on August 7, 2009, that plaintiff should have immediately been advised to stop working following his original diagnosis in July 2006 until his diabetic condition came under control.[10] (Id. ¶ 26, Glorioso Dep. Tr. 15-16, 33, Aug. 7, 2009, Pl.'s Concise S.F. at Ex. 7.) Dr. Glorioso testified that, although plaintiff was still practicing, he was unable to practice as a cardiothoracic and thoracic surgeon due to the neuropathies and vascular problems related to plaintiff's diabetic condition. (Id. ¶ 83, Glorioso Dep. Tr. 17-18, 34-35, 77, Pl.'s Concise S.F. at Ex. 7.) Dr. Glorioso never told plaintiff he was totally disabled from practicing as a cardiothoracic and vascular surgeon or to stop working. (Id.) Dr. Glorioso told plaintiff to stop operating because plaintiff posed a safety risk to himself and to his patients. (Id. ¶ 84, Glorioso Dep. Tr. p. 22, 23, 32, 75-77, Pl.'s Concise S.F. at Ex. 7.)

---

[10]    Defendant claims there is nothing in the July 6, 2006 lab results that indicated plaintiff could not perform the substantial and material duties of a cardiothoracic and vascular surgeon. (C.S.F. ¶ 25.) (Wetzel-Saffle Dep. Tr. 23.)

### D. Cut-backs in Plaintiff's Practice

Following plaintiff's diagnosis in July 2006, plaintiff met with his office staff and advised them he would be cutting back his practice.  (Id. ¶ 85, Haning Tr. p. 18-19, 22-23, 29, Pl.'s Concise S.F. at Ex. 10.)[11]  He reduced the amount of surgeries he performed at hospitals other than Wheeling Hospital, and discontinued office hours at several satellite offices.  (Id. at ¶ 86.)  Plaintiff's office manager, Stefanie Haning, testified that although plaintiff continued to work five days per week in the office and operating room between July 2006 and May 2007, he did less during the day, and cut back available office hours and the number, length and complexity of surgeries performed.  (Id. ¶ 28, Haning Dep. 42-44, May 1, 2009, Pl.'s Concise S.F. at Ex. 10.)

Beginning in July 2006, plaintiff reduced significantly the number of open heart surgeries he performed, although he performed a few such surgeries.  (Id. ¶ 43, J. Klay Dep. Tr. 98, Pl.'s Concise S.F. at Ex. 2.)  Before July 2006, plaintiff operated five days a week.  (Id. ¶ 44.)  Since the onset of his disability plaintiff operates two days a week.  (Id.)  In December 2007, plaintiff met with Elias Edward Joseph ("Joseph"), the agent for his medical malpractice insurance carrier, and advised Joseph about plaintiff's health problems that arose in 2006.  (Id. ¶ 49, Joseph Dep. Tr. 22, Pl.'s Concise S.F. at Ex. 6)  On December 5, 2007, Joseph wrote a letter to plaintiff's medical malpractice carrier advising that plaintiff had a personal health issue in 2006 and substantially reduced his practice.  (Id.; letter dated Dec. 5, 2007, Pl.'s Concise S.F. at Ex. 11.)

---

[11]     Defendant argues there is no evidence that plaintiff significantly reduced the number of surgeries he was performing, and that plaintiff continued to maintain a significant surgery practice through at least February 2009, as indicated by Wheeling Hospital's operating room records and the procedure code analyses showing there was no material change in the number or type of procedures that plaintiff performed between July 2006 and April 2007.  (Id. ¶ 84, J. Klay Dep. Tr. 189-90, 241, Def.'s S.F. at  Exs. 10 (Doc. Nos. WH 174, 176, 178), 13A, 13C).

### E.  Surgeries Performed Prior to and After July 2006

Before and after July 2006, plaintiff performed thoracotomies, bronchoscopies, thrombectomies, carotid artery endarterectomies, sphenous vein and posterior tibeal endarterectomies, femoral and peroneal femoral bypass grafts, aortic bifemoral bypasses, node biopsies, mediastinocipies, abdominal aortic aneurism repairs, pleural biopsies, profunda bypass graphs and leg amputations; emplaced and removed mediport catheters for chemotherapy; inserted dialysis catheters; and removed portions of the lung and repaired aneurisms. (Id. ¶ 45, Haning Dep. 46, 51-55, Def.'s S.F. at Ex. 31.)  The number of surgeries plaintiff performed prior to July 2006 for the insertion and removal of pacemakers, amputations and wound care – usually resulting from vascular disease – did not change after July 2006.  (Id. ¶ 46.)  Before July 2006, plaintiff did not perform arteriograms, but performed them after that time.  (Id. ¶ 47.)

On November 12, 2007, plaintiff applied at Wheeling Hospital for the privilege to perform twenty-three different cardiac surgeries,[12] seventeen thoracic surgeries,[13] and fourteen vascular surgeries.[14]  (Id. ¶ 37.)  In the applications plaintiff attested that he was

---

[12]     Cardiac surgery privileges included: "Coronary Artery Bypass Procedures"; "Valve Repair and/or Replacement"; "Repair Surgical Complications of Myocardial Infarction: Ventricular Aneurysm", "Acquired Ventricular Septal Defect", "Cardiac Rupture", "Acute Valve Dysfunction"; "Management of Trauma to the Heart and Great Vessels"; "Aortic Reconstructive Surgery: Ascending or Transverse Aortic Arch Replacement", "Aortic Branch Repair, Endarterectomy, Bypass", "Descending Aortic Repair or Replacement"; "Repair Adult Congenital Cardiac Abnormalities"; "Pulmonary Artery Embolectomy"; "Cardiopulmonary Bypass for: Circulatory Support", "Respiratory Failure"; "Pericardial Procedures"; "Intra-Aortic Balloon for Counterpulsation: Insertion", "Removal", "Management"; **"Pacemaker/AICD implantation"**; "Right Heart Catheterization (Swan-Ganz Placement)"; "Arterial Line Placement"; "Venous Central and Peripheral Line Placement", "Ventricular Assist Device"; and "Transmyocardial (Co2 Laser) Revascularization".  (Def.'s S.F. at Ex. 9A)(emphasis added).

[13]     Minor thoracic surgical privileges included: "Scalenotomy"; "Thoracentesis"; and "Tube Thoracotomy". Major thoracic surgical privileges included: "Bronchoscopy Flexible"; "Brochoscopy [sic] Rigid"; "Chest Wall Reconstruction"; "Epicardial/Endocardial Pacemaker"; "Esophageal Surgery"; "Insertion Intra-Aortic Balloon Pump"; "Lobectomy & Segmentectomy & Biopsy"; "Pheumonectomy"; "Thoracic-Abdominal Incision"; "Thoracic Sympathectomy"; "Thoracoplasty"; "Thoracoscopy"; "Transvenous Pacemaker Implant"; and "Ventilator Management".  (Id.)

> physically and mentally able to perform all of the essential . . .
> functions or services necessary to exercise the privileges applied
> for . . . [was] able to perform these functions without significant
> risk of injury to [himself] or others [and did not] . . . presently have
> a physical or mental health condition…that affects, or is
> reasonably likely to affect [his] ability to perform professional or
> medical staff duties appropriately[.]

(Id., Def.'s S.F. at Ex. 9A.)  These were the same procedures for which plaintiff was granted

privileges in 2005.  (Id., Def.'s S.F. at Ex. 9B.)  Although hospital records reflect use of the

operating room with respect to numerous surgical procedures performed by plaintiff from July

2006 through the present lasting three hours or more, including seven-hour procedures on

January 2, 2009 and on December 12, 2008, an eight-hour procedure on February 18, 2009, and

an eleven-hour procedure on October 24, 2008,[15] plaintiff claims these records are not reflective

of the actual amount of time a surgeon spends operating.  (Id. ¶ 38, J. Klay Dep. Tr. 107, Pl.'s

Concise S.F. at Ex. 2.)  Frequently, the patient is in the operating room  ("OR") without the

surgeon; the surgeon comes into the OR to confirm that the patient is the correct patient;

conducts a limited amount of surgery; leaves the OR to consult x-rays, takes breaks, and returns

to the OR to finish the surgery.  (Id.)

     As of January 2009, plaintiff had not informed the hospitals where he worked that he can

no longer perform the duties of a cardiothoracic and vascular surgeon.  (Id. ¶ 48.)  As of January

9, 2009, plaintiff continued to operate two days per week, saw patients in his office one day a

week and performed operations lasting up to 2.5 hours.  The amount of time plaintiff spent

---

[14]     Vascular surgical privileges included:  "Abdominal Aneurysmectomy"; "Aneurysmectomy of the
Extremities"; "Arterio-Venous Shunts of Upper and Lower Extremities"; "Carotid Artery Reconstruction";
"Embolectomy"; "Endovascular Surgery"; "Interpretation of Noninvasive Vascular Studies: Carotid Duplex",
"Peripheral Vascular Studies"; "Intra Abdominal Grafts and Endarterectomies"; "Lower Extremity
Amputations/Revisions"; "Micro-vascular surgery"; "Peripheral Vascular Grafts and/or Endarterectomies";
"Thrombectomy"; and "Venous Reconstruction".  (Id.)

[15]     See C.S.F. ¶ 38; Def.'s S.F., Ex. 10; WH 174, 176 and 178.

actually operating, however, was much less because he took breaks during surgery to get off of his feet. (Id. ¶ 39, J. Klay Dep. Tr. 107, Pl.'s Concise S.F. at Ex. 2). Plaintiff no longer performs open-heart surgeries, certain procedures that go hand in hand with open-heart surgeries, and complicated vascular surgeries. (Id. ¶ 87, J. Klay Dep. Tr. 101-02, Pl.'s Concise S.F. at Ex. 2)[16]. Plaintiff still performs routine pacemaker surgeries that take no more than an hour to an hour and a half. (Id. ¶ 88, Haning Dep. Tr. 24-25; Pl.'s Concise S.F. at Ex. 10.)

Plaintiff's current practice consists of eighty to ninety percent vascular surgeries, up to ten percent thoracic surgeries and up to ten percent pacemaker surgeries. (Id. ¶ 89.) When shown current procedural terminology ("CPT") codes relating to approximately 290 different procedures set forth in exhibits 11A (analysis of Klay's CPT codes), and 11B (monthly report on procedures performed by Klay), plaintiff testified that - except for one procedure - the procedures listed in exhibit 11A were material and substantial duties of a cardiothoracic surgeon. (Id. ¶ 40, J. Klay Dep. Tr. 109-122, Pl.'s Concise S.F. at Ex. 2; Def.'s S.F. at Exs. 11A, 11B (Docket No. 74))[17] The substantial and material duties of a cardiothoracic and vascular surgeon include procedures related to pacemakers, transplant grafts of the leg, arm, abdomen and heart, carotid surgery, chest surgeries and peripheral surgeries of the arms and legs. (Id. ¶ 41.) Through January 20, 2009, plaintiff continued to perform a number of the procedures set forth in exhibits 11A and 11B. (Id. ¶ 42, J. Klay Dep. Tr. 95-106, 109-117, Pl.'s Concise S.F. at Ex. 2.)

---

[16]     Defendant claims that plaintiff performed open-heart surgeries through at least January 2009. (Pl.'s Resp. to S. F. ¶ 43; Def.'s S.F. Ex. 10 generally.)

[17]     Plaintiff asserts that he did not testify that he had performed every procedure described by the CPT codes - set forth in exhibit 11A - prior to the onset of his disability. (C.S.F. ¶ 40, J. Klay Dep. Tr. 109-122, Pl.'s Concise S.F. at Ex. 2.) With respect to plaintiff's testimony about the procedures set forth in exhibit 11B, plaintiff asserts that his testimony was distinct from his testimony about the procedures set forth in exhibit 11A. (Id.)

**F.    Plaintiff's Malpractice Insurance Renewal Applications**

On a malpractice insurance renewal application dated September 16, 2005, plaintiff indicated he saw forty-five scheduled patients per week.  (Id. ¶ 52, Def.'s S.F. at Ex. 12D.)  On a malpractice insurance renewal application dated October 16, 2006, plaintiff selected a range indicating he saw between twenty-six and fifty patients per week.  (Id.; Def's S.F. at Ex. 12A.)  Plaintiff completed another renewal application for malpractice insurance on December 3, 2007.  (Id. ¶ 50, Def.'s S.F. at Ex. 12B.)  Plaintiff responded "yes" to certain questions asked on the October 2006 and the December 2007 applications, including "[d]o you perform minor surgery?" and "[d]o you perform major surgery?".  (Id., Def.'s S.F. at Exs. 12A and 12 B.)

On the October 2006 and December 2007 applications plaintiff responded "no" when asked whether "now or within the past twelve months [plaintiff] had any chronic illness or physical defect?"  (Id. ¶ 53.)  On the same malpractice renewal applications, plaintiff responded "no" when asked

> [h]ave you had any changes in your practice that you have not
> previously reported to WV Physician's Mutual Insurance
> Company? (such as: specialty, type of practice, number or type of
> diagnostic or surgical procedures performed, employment,
> moonlighting activity, hours practiced per week, hospital
> privileges or their status, percentage of practice or admissions at
> the hospitals where you have privileges, ancillary personnel, office
> location(s), mailing address, phone numbers, etc.)

(Id. ¶ 54.)

On the October 2006 and December 2007 applications plaintiff indicated he performed the following procedures: local anesthesia, angiography, angioplasty, arterial catheterization, diagnostic catheterization, endoscopy (other than proctoscopy), sigmoidoscopy, colposcopy and cystoscopy, permanent pacemaker and radiopaque dye injection.  (Id. ¶ 55.)   Plaintiff signed the October 2006 and December 2007 applications attesting:

I hereby declare that the foregoing statements and particulars are, to the best of my knowledge and recollection are [sic] correct [and], complete and that I have not willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof.

(<u>Id.</u> ¶ 57.)

On November 4, 2008, plaintiff completed another malpractice insurance renewal application.  (<u>Id.</u> ¶ 51, Def.'s S.F. at Ex. 12C.)  Plaintiff again responded "yes" to questions such as, "[d]o you perform minor surgery?" and "[d]o you perform major surgery?".  (<u>Id.</u>)  With respect to major surgeries, plaintiff indicated that he performed cardiac, thoracic and vascular surgery and implanted pacemakers.  (<u>Id.</u>)  In that application plaintiff reported that he performed local anesthesia, angiography, angioplasty, arterial catheterization, diagnostic catheterization, fluoroscopy, permanent pacemaker and radiopaque dye injection.  (<u>Id.</u> ¶ 56.)  The application was signed by plaintiff with the same the attestation used in the October 2006 and December 2007 applications.  (<u>Id.</u> ¶ 58.)

### G.  DMS's Adjuster

 Plaintiff authorized his agent, Guy Filewich, to email defendant on September 5, 2007, that plaintiff wanted payment for fifty percent disability immediately and felt likely that he would be fully disabled within approximately six months, at which time he would want 100% of his benefit.  (<u>Id.</u> ¶ 91, J. Klay Tr. P. 165; Verdi Dep. Tr. 114-16, 118; Verdi Aff. ¶¶ 7, 13; Def.'s S.F. Exs. 15-17, 20).

During Klay's initial contact with Philip A. Verdi ("Verdi"), DMS's adjuster assigned to handle his claim, Verdi failed to explain to Klay the difference between the available coverages to which he  may be entitled under the policies.  (<u>Id.</u>, Verdi Dep. Tr. 114-15 Pl.'s Concise S.F. at Ex. 14.)  Verdi was "adversarial and condescending" in conversations with Klay.  (<u>Id.</u> ¶ 93,

(Klay Dep. Tr. 251-52, Pl.'s Concise S.F. at Ex. 2.) Verdi, in letters to Klay dated August 13, 2007, September 11 and 28, 2007 and November 6, 2007, discussed total disability and residual disability coverages and the information necessary to support claims for those coverages.  On August 13, 2007, Verdi advised plaintiff that the late filing of his claim might impact plaintiff's ability to submit the required proof of loss and defendant's ability to verify satisfactorily the accuracy and reliability of the information.  (Id., J. Klay Dep. Tr. 55-61, 261, 263-64, Def.'s S.F. at Ex. 33; Verdi Aff. ¶ 12, Response to Plaintiff's Additional Statement of Facts ("Def.'s Resp. to Pl.'s S.F") at Ex. 9 (Docket No. 79-9.))  Verdi requested that plaintiff submit documentation for work performed from January 1, 2006 through the present and by letter dated November 7, 2007, Verdi requested plaintiff provide details to support his allegations that DMS was confrontational with plaintiff in handling plaintiff's claims.  (Id.)

When plaintiff asked Verdi's supervisor for assistance with plaintiff's claim, he was told the supervisor was too busy to help.  (Id. ¶ 94, (Klay Dep. Tr. 252, Pl.'s Concise S.F. Ex. 2.) Plaintiff sought assistance from defendant's divisional vice-president branch manager, Matt Folgia ("Folgia"), to report that he was dissatisfied with Verdi's handling of plaintiff's claim. (Id. ¶ 95, see Complaint Tracking System, DMS - Doc. No. 2644, Pl.'s Concise S.F. at Ex. 15.) Foglia commented that "he could understand why, because when [Foglia] was speaking to Verdi, [Verdi] made  a wise comment to [Foglia] and [Folgli] sees how anyone could take offense." (Id.)  Following plaintiff's complaint, plaintiff received a call from an employee of defendant, Marshall Saunders, who advised plaintiff that defendant reviews DMS' claim handling policies "to ensure that they meet applicable standards" and that defendant believed "that the proper course of action is for the people who are more familiar with [plaintiff's] claims and situation, to respond to any concerns that [plaintiff] might still have."  (Id. ¶ 96, Pl.'s Concise S.F. at Ex. 15.)

Verdi was not required to undergo any training prior to his employment with DMS in January 2001 and since that time had no additional education or training, beyond on-the-job training, concerning disability claims. (Id. ¶ 97, Verdi Dep. Tr. 33-34, Pl.'s Concise S.F. at Ex. 14.)[18] Verdi did not receive formal training or education from defendant concerning the interpretation of terms contained in the disability policies issued by AXA. (Id. ¶¶ 99-100.) (Verdi Dep. Tr. 27, Pl.'s Concise S.F. at Exs. 14, 16.) Verdi did not utilize any of the following tools made available to him by DMS for its adjusters in handling disability claims: occupational analysis, consultation with an occupational specialist, a job analysis, a physical examination, or consultation with a physician who practices in the same field as the insured. (Id. ¶ 101, Verdi Dep. Tr. 81, 99-100, 106-08, 111, Pl.'s Concise S.F. at Ex. 14.) Verdi was to respond to telephone calls from defendant's insureds concerning coverage questions interpreting insurance policies. (Id. ¶ 102, Verdi Dep. Tr. 56-57) Verdi explained that the meaning of "material and substantial duties" is determined by referring to the clear definition in the policies, and applying it on a case-by-case basis. (Id. ¶ 103, Verdi Dep. Tr. 67-69, Pl.'s Concise S.F. at Ex. 14.) Verdi reviewed plaintiff's tax returns, malpractice insurance applications, CPT code reports, profit and loss reports, and the duties and procedures plaintiff performed in his practice. (Id., Verdi Dep. Tr. 58-64.)

Defendant became aware that the American Medical Association had a book on CPT codes published for physicians and insurance companies. (Id. ¶ 104.) Defendant purchased the CPT codes and created an Excel spreadsheet to summarize the codes. (Id.) Verdi is responsible

---

[18] Defendant disputes plaintiff's characterization of Verdi's training, noting that in a previous employment Verdi administered claims brought under disability insurance policies and obtained professional designations in handling life and health insurance claims. Verdi's on-the-job training included working with various claim managers, training on DMS's intranet, and attending presentations from DMS's law department. (Verdi Dep. Tr. 18-24, 33-37, 103-05, Def.'s Resp. to Pl.'s S.F. at Ex. 12; Verdi Aff. ¶¶ 3-5, Def.'s S.F. at Ex. 9.)

for interpreting the data on the spreadsheet. (Id.) CPT codes are used to describe treatment procedures for uniform billing by physicians and are the titles given to operative and nonoperative procedures. (Id. ¶ 105, Klay Dep. Tr. 90, Pl.'s Concise S.F. at Ex. 2.) CPT codes do not reflect the different levels of effort from emotion to physical or the time involved in a given practice. (Id.) Identical CPT codes do not differentiate or reflect the length of any one particular procedure, or reflect the effort that was required by the surgeon to complete the particular procedure. CPT codes do not reflect any complications that may have arisen during the procedure unless additional coded procedures were performed. (Id. ¶ 106.) Verdi did not have any formal training in the interpretation of CPT codes. (Id. ¶ 107.)

Based upon various analyses, Verdi determined that Klay had been residually disabled since April 2007. (Id. ¶ 67.) Klay has been paid residual disability benefits since that time. (Id.)

## IV.    Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact-finder could find in that party's favor at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A nonmoving party, like

plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'" <u>Orenge v. Veneman</u>, No. 04-297, 2006 WL 2711651, at *2 n.1 (W.D. Pa. Sept. 20, 2006) (citing <u>Celotex</u>, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. <u>Anderson</u>, 477 U.S. at 248. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. <u>Id.</u> at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. <u>Horta v. Sullivan</u>, 4 F.3d 2, 8 (1st Cir. 1993); <u>Pollack v. City of Newark</u>, 147 F. Supp. 35, 39 (D. N.J. 1956), <u>aff'd</u>, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

## V. Discussion

It is undisputed that Pennsylvania law should be applied to interpret the provisions of the policies and that this court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

### A. <u>Count I - Declaratory Judgment</u>

At count I, plaintiff seeks to have this court judicially determine, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that: 1) the policies issued by defendant provide coverage to plaintiff for his claim of total disability; 2) defendant is legally obligated to satisfy plaintiff's claim of total disability; and 3) defendant's failure to do so to date has caused plaintiff

damages as set forth in the amended complaint. The Declaratory Judgment Act provides in relevant part:

> In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

The court has discretion in determining whether to grant declaratory relief. <u>Wilton v. Seven Falls Company</u>, 515 U.S. 277, 282-88 (1995). Generally, declaratory relief may properly be denied when an alternative remedy is "better or more effective." 10 B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2758 (3d ed. 1998).

Defendant argues that in order for the court to grant declaratory relief plaintiff must prove that he became totally disabled on July 6, 2006, as defined by the insurance policies, he has fulfilled all conditions precedent to defendant's obligation to pay him, and defendant breached its obligation to plaintiff. In plaintiff's response to the Motion, plaintiff conflates his claim for declaratory relief with his claim for breach of contract. The outcome of the Motion with respect to plaintiff's claims for declaratory relief and breach of contract turn on the same factual matters and the resolution of the breach of contract claim will be dispositive of the claim for declaratory relief. The thrust of plaintiff's arguments sound in breach of contract. Under those circumstances, the court will decline to consider the request for a declaratory judgment.

### B.   Count II - Breach of Contract

Plaintiff claims defendant breached its contract with plaintiff by failing to conduct a proper investigation followed by a fair and equitable resolution of plaintiff's claim. Plaintiff

argues that he is entitled to recover additional benefits under his disability policies beyond what defendant paid him and seeks damages as a direct and proximate result of defendant's alleged failures.

Defendant argues that the total disability definition must be read along with the residual disability definition, and that the residual disability rider expands coverage in situations where an insured's circumstances do not meet the definition of total disability. Defendant argues that for plaintiff to be eligible for total disability benefits, plaintiff must prove his inability due to injury or sickness to engage in the substantial and material duties of plaintiff's regular occupation. Defendant believes that plaintiff is not totally disabled, because plaintiff continued to work in his regular occupation as a cardiothoracic and vascular surgeon.

It is undisputed that 1) plaintiff's regular occupation is as a cardiothoracic and vascular surgeon; 2) AXA issued plaintiff six disability insurance policies; and 3) each policy has a total disability provision and a residual disability rider.

### 1.     Interpreting Insurance Policies under Pennsylvania Law

"The basic principles of law governing insurance policy interpretation are well-settled in Pennsylvania." Regents of Mercersburg College v. Republic Franklin Ins. Co., 458 F.3d 159, 171 (3d Cir. 2006) (citing E. Associated Coal Corp. v. Aetna Cas. & Surety Co., 632 F.2d 1068, 1075 (3d Cir.1980)). "The goal of interpreting an insurance policy, like the goal of interpreting any other contract, is to determine the intent of the parties." Id. "It begins where it must – the language of the policy." Id. (citing Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) ("The polestar of our inquiry . . . is the language of the insurance policy.")).

Under Pennsylvania law, the interpretation of an insurance contract is a matter of law for the court. Lexington Ins. v. Western Penn. Hosp., 423 F.3d 318, 323 (3d Cir. 2005). Where the language of the insurance contract is clear and unambiguous, a court is required to give effect to that language; where, however, a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Lexington Ins., 423 F.3d at 323 (quoting Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co., 517 A.2d 910, 913 (Pa. 1986)). "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" Regents of Mercersburg College, 458 F.3d at 172 (quoting Hutchison v. Sunbeam Coal Co., 519 A.2d 385, 390 (Pa. 1986); citing Madison Constr. Co., 735 A.2d at 106)). Courts should not, however, distort the meaning of the language or strain to find an ambiguity. USX Corp. v. Liberty Mutual Ins. Co., 444 F.3d 192, 198 (3d Cir. 2006) ("[I]n Pennsylvania, and no doubt elsewhere, '[c]lear policy language . . . is to be given effect, and courts should not torture the language to create ambiguities but should read the policy provisions to avoid it.'") (quoting Selko v. Home Ins. Co., 139 F.3d 146, 152 n.3 (3d Cir. 1998)); Steuart v. McChesney, 444 A.2d 659, 663 (Pa. 1982).

Courts are to consider the entire policy and not view provisions of a policy in isolation. "A firm foundational rule in the construction of insurance contracts is that the expressed intent of the parties is to be ascertained by examining the contract or policy as a whole." STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS, 2 COUCH ON INSURANCE §21:19 (3d ed. 2010) (citing Morgan Smith Auto. Prods., Inc. v. Continental Ins. Co., 210 A.2d 273, 275 (Pa. 1965); Del. Cnty. Const. Co. v. Safeguard Ins. Co., 228 A.2d 15 (Pa. Super. Ct. 1967) (all provisions of a policy are to be read together and construed according to the plain meaning of the words

involved, to avoid ambiguity while giving effect to all provisions.)  "The accepted rule is that where a repugnancy exists between different clauses of an insurance policy, the whole should, if possible, be construed so as to conform to the evident consistent purpose of the parties." Id. § 22:44.  It is well recognized that a court when interpreting a policy should not insert words into the policy.  "An insurance policy which is clear and unambiguous must stand as written, the same as any other contract, without alteration by adding new terms or dropping existing terms, save with the consent of the contracting parties or their duly authorized agents acting within the scope of their authority." Id. at §21:17.

The crux of the issue at hand is whether plaintiff's circumstances rise to the level of total disability, as defined in the policies.  To resolve that issue, it is necessary to consider whether plaintiff adduced sufficient evidence to meet the definition of total disability or the definition of residual disability.  The terms "total disability" and "residual disability" are defined in the six disability policies.  Total disability is defined in all six policies as "[the] inability due to injury or sickness to engage in the substantial and material duties of your regular occupation."  (Pl.'s Concise S.F. at Ex. 1A-B).  The initial residual disability rider defines residual disability as

> your inability due to injury or sickness to perform: 1. one or more of the important duties of your occupation; or [2.] the important duties of your occupation for as much time as is usually required to perform them.

(Def.'s S.F. at Ex. 3B.) (emphasis added).  Residual disability is defined in five of the six policies as:

> your inability due to injury or sickness to perform: (1) one or more of the substantial and material duties of your occupation; or (2) the substantial and material duties of your occupation for as much time as is usually required to perform them.

Id. (emphasis added).  The parties do not dispute that the resolution of the issues relating to the terms "material and substantial" will be dispositive of the issues relating to the word "important."

   a.)  "<u>Material and Substantial</u>"

   Plaintiff contends that ambiguity exists in the insurance policy language regarding the phrase "material and substantial duties," because that phrase is undefined in the policies and can be construed in more than one way.  Plaintiff relies upon, among other decisions, <u>Fleishman v. General American Life Insurance Co.</u>, 839 A.2d 1085, 1088-89 (Pa. Super. Ct. 2003).  In <u>Fleishman</u>, the appellate court noted the phrase, "unable to perform <u>all</u> the material and substantial duties," used in the policy at issue in that case could be construed in more than one manner and could suggest "an incapacity to perform any material or substantial duty of the insured's regular occupation, to perform any single one, or to perform any of several of the required duties."  <u>Id.</u> (emphasis added).  The issue before the court in <u>Fleishman</u>, however, was not whether particular terms were ambiguous, but whether the jury instructions gave the proper guidance with respect to the meaning of total disability.  <u>Id.</u> at 1087-88.  In reviewing the trial court's decision to grant a motion for a new trial, the appellate court found that trial court erred in providing only a quantitative measure of disability when a qualitative measure also should have also been explained.  <u>Id.</u>  The appellate court reasoned that, although Pennsylvania law does not require the distinction, the court was obligated to explain crucial contract terms as the law understands them, and that "given the significance of the term total disability in understanding the case, the court's failure to provide a comprehensive definition was fatal."  <u>Id.</u> at 1088.

Two federal courts analyzing Pennsylvania law determined that the words "material and substantial" - in the context of interpreting a disability insurance policy – were not ambiguous. Doe v. Provident Life and Acc. Ins. Co., No. Civ. A. 96-3951, 1997 WL 214796, at *4 (E.D. Pa. Apr. 22, 1997); Myers v. Liberty Life Assurance Co., No. Civ. A. 99-1077, 2002 WL 1019029, at *9 (E.D. Pa. May 20, 2002). In Doe, the court stated:

> I find that the language "not able to perform the substantial and material duties of your occupation" is clear and unambiguous. This language contains neither legalese nor terms of art beyond the understanding of a reasonable policyholder. Instead, the terms are commonly-used words with generic meanings. Having found the policy language to be clear and unambiguous, the law directs that the language should be read by the jury in accordance with its plain and ordinary meaning. Accordingly, any evidence concerning the meaning of the definition of total disability contained in the three policies is inadmissible parol or extrinsic evidence under Pennsylvania law. *See Commonwealth, Dep't of Transp. v. Brozzetti,* 684 A.2d 658, 663 (Pa.Commw.1996) (citing *Pennsylvania Dep't of Transp. v. E-Z Parks, Inc.,* 153 Pa.Cmwlth. 258, 620 A.2d 712 (Pa.Commw.1993)).

Doe, 1997 WL 214976, at *4 (footnote omitted). The court in Myers relied upon Doe in its findings of fact and conclusions of law and concluded:

> The language "unable to perform all of the material and substantial duties of his occupation" needs no specific definition in the Plan because it is clear and unambiguous. *See Doe v. Provident Life and Accident Ins. Co.,* No. Civ. A. 96-3951, 1997 WL 214796, at *4 (E.D.Pa. Apr. 22 1997). This language contains neither legalese nor terms of art beyond the understanding of a reasonable policyholder. *See id.*

Myers, 2002 WL 1019029, at *9.

With respect to this issue, the court, like the courts in Doe and Myers, finds that the words "material and substantial" as they relate to the interpretation of the definitions of total disability and residual disability are not ambiguous. Plaintiff's arguments that the language must

be construed in his favor and that parole evidence is permissible to explain, clarify or resolve any ambiguity are moot. A finding that the terms "material" and "substantial" are not ambiguous does not end the court's inquiry. The real issue is whether the word "the" as used before the phrase "material and substantial duties" should be read as "all the."[19]

### b.)    Ability to Perform Some Duties

Plaintiff argues that his ability to perform some of the duties of his regular occupation does not disqualify him from recovery of total disability benefits. There is no dispute that plaintiff's regular occupation for purposes of the policies was as a cardiothoracic and vascular surgeon. The analysis whether the duties of a particular cardiothoracic and vascular surgeon are "material and substantial" at one point in time as compared to another point in time does not call for an interpretation of the words "material," "substantial" or "important;" rather, the analysis is whether the duties engaged in are material and substantial duties.

Plaintiff argues that his lack of ability to perform open heart surgeries, as well as lengthy and complex vascular and thoracic surgeries – which he was able to do prior to the onset of his disability – qualifies him for the benefits of total disability, as defined under the policies. Plaintiff contends that his abilities to perform some surgeries, does not, by itself, preclude him from total disability benefits. Plaintiff relies on <u>Cobosco v. Life Assurance Company of Pennsylvania</u>, 213 A.2d 369, 373 (Pa. 1965). In analyzing the question of total disability the Supreme Court of Pennsylvania in <u>Cobosco</u> instructed:

> In our opinion, . . . the question of 'total disability' must be decided in the context of the ability of the insured to perform the acts or duties necessary to the operation of a business owned by him, . . . the insured must prove that the personal efforts that he himself is capable of making in the operation of the business are

---

[19]     It is noteworthy that in <u>Fleishman</u>, a decision relied upon by plaintiff, the language in the relevant policy was "unable to perform <u>all</u> the material and substantial duties of your regular occupation . . . ." <u>Fleishman</u>, 839 A.2d 1088 (emphasis added).

insubstantial and unimportant, by reason of their low quality or quantity, in relation to the character and amount of work required to carry on the business. Moskowitz v. Prudential Insurance Company, supra [35 A.2d 567, 569 (Pa. Super. Ct. 1944)]; Cobb v. Mutual Life Insurance Company of New York, supra [30 A.2d 211 (Pa. Super. Ct. 1943)]; Feigenbaum v. Prudential Insurance Company of America, 144 Pa.Super. [Ct.] 412, 19 A.2d 542 (1941); Eisenhauer v. New York Life Insurance Company, 125 Pa. Super. [Ct.] 403, 189 A. 561 (1937); Butler v. Metropolitan Life Insurance Company, supra [186 A. 395 (Pa. Super. Ct. 1936)].

Cobosco, 213 A.2d at 373 (footnote omitted).

The Cobosco rationale does not help plaintiff. Plaintiff does not dispute that he is still performing some of the material and substantial duties of his prior occupation and that he is functioning as a cardiothoracic and vascular surgeon, albeit not doing or cutting back on complex surgeries. No reasonable jury could find the cardiothoracic and vascular surgeries he continues to perform are insubstantial or unimportant. While not as complex as some surgeries, i.e., open heart surgery, they are not in low quality or quantity in relation to the practice of cardiothoracic and vascular surgery. The thrust of plaintiff's argument is that he is not able to perform all the material and substantial duties of his prior occupation. It is somewhat of a misnomer to refer to a "prior" occupation in the context of this case. Plaintiff undisputedly continued after 2006 to perform as a cardiothoracic and vascular surgeon. What is different after July 2006 is that he cut back doing more complex cardiothoracic and vascular surgeries, such as open heart surgeries, but he is still doing cardiothoracic and vascular surgeries. Thus, he is doing some – but not all – of the material and substantial duties of his regular occupation.

Plaintiff argues that he adduced evidence to refute defendant's assertion that he is performing the material and substantial duties of his occupation. He contends that the record shows that he continues to suffer from diabetic complications, such as diabetic neuropathy, trigger fingers, Reynaud's Syndrome, stasis ulcers, and aggravated supra ventricular achycardia

or paroxysmal atrial tachycardia – a condition that may cause interruption of blood flow to the brain. Defendant did not dispute any of plaintiff's medical diagnoses. Klay is insulin dependent and takes up to eight injections a day. He is physically unable to stand for extended periods of time, respond to prolonged hourly demands for patient care and management, or take medications at proper times during prolonged work hours. Overall, plaintiff argues that he is unable to carry out work as a cardiothoracic and vascular surgeon. Plaintiff, however, continues to perform some of the material and substantial duties of his occupation.

Upon the advice of his treating physician, plaintiff met with his office staff and told them he was cutting back on his practice. He reduced the amount of surgeries he performed at hospitals other than Wheeling Hospital, and discontinued office hours at several satellite offices. After July 2006, plaintiff did not perform open heart surgeries or several procedures that go hand-in-hand with open heart surgeries. Prior to July 2006, plaintiff's practice consisted of thirty percent cardiac, thirty percent thoracic and forty percent vascular surgeries. His practice now consists of eighty to ninety percent vascular surgeries, up to ten percent thoracic surgeries and up to ten percent pacemakers. The pacemaker surgery plaintiff states is simple in nature and takes no more than an hour to an hour and a half to perform. It is undisputed that pacemaker surgery is a cardiac surgery procedure.

Dr. Wetzel-Saffle testified that as of November 15, 2007, plaintiff was no longer able to perform the material and substantial duties of a vascular surgeon. That testimony, however, is inconsistent with plaintiff's current practice consisting of eighty to ninety percent vascular surgeries. Dr. Glorioso testified that plaintiff is unable to practice as a cardiovascular and thoracic surgeon due to his diabetic condition, as well as the diabetic complications that plaintiff has experienced, including neuropathy of the lower extremities and vascular problems. That

testimony is inconsistent with plaintiff's current practice. The issue under the policies is not whether plaintiff <u>should</u> quit performing the material and substantial duties of his regular occupation, but whether he was unable to engage in those duties. No reasonable jury can dispute that his performing the duties is irrefutable evidence that he is able to perform those duties. Once again, plaintiff's argument is that the definition of total disability only requires that he is not able to perform one or more of the material and substantial duties of his regular occupation. The record demonstrates that he can show he no longer performs some of those duties. Indeed, AXA does not dispute that assertion and found plaintiff to be residually disabled.

Defendant argues that the total disability definition must be read in concert with the residual disability rider. Plaintiff responds that defendant's position necessarily implies that an insured who purchases only the total disability policy without the residual disability rider receives broader coverage than an insured – such as plaintiff – who purchased both. Nonetheless, plaintiff argues that even construing the residual disability rider and the total disability definition in concert only creates a continuum of disability under the entire policy and does not indicate where residual disability coverage ends and total disability coverage begins.

In <u>DiTommaso v. The Union Central Life Ins. Co.</u>, No. 89-6323, 1991 WL 124601, at *2-5, (E.D. Pa. Jul. 08, 1991), the district court considered the plaintiff's eligibility for total disability benefits. In that case the plaintiff was an osteopathic practitioner. <u>Id.</u> at *3. His occupation was as a general practitioner and his practice included general medicine, minor surgery and manipulations. <u>Id.</u> at *1. The plaintiff could no longer perform surgeries due to an injury to one of his hands which affected his ability to perform surgery or most manipulations. <u>Id.</u> The plaintiff filed for total disability benefits under an insurance policy. The relevant policy in <u>DiTommaso</u> defined total disability as a disability which "continuously prevents the insured

from engaging in the regular occupation of the insured at the time disability begins." Id. at * 2. The policy also contained a rider which provided for residual benefits if the insured was unable to perform: "one or more of the insured's daily business duties; or . . . the insured's usual daily business duties for as much time as is usually required to perform such duties." Id.

The court found that the plaintiff was not totally disabled within the meaning of that term in the policy and summary judgment was granted in favor of the insurer. Id. at *3. The court reasoned, that based upon the plain language of the policy as a whole, even though the plaintiff could no longer engage in surgery, the plaintiff was capable of performing the other duties of his occupation – a general practitioner – and continued to earn his living as an osteopathic physician, despite his disability. Id. The court noted that this interpretation was supported by the language of the residual clause, "which specifically provided for a situation where plaintiff would become unable to perform one or more of the duties of his occupation as an osteopathic physician" and that plaintiff's interpretation of the policy would "render [the] residual clause ineffective." Id.

In DiTommaso v. Union Central Life Insurance Co., Civ. A. No. 89-6363, 1991 WL 249977, at * 2 (E.D. Pa. Nov. 25, 1991), aff., 972 F.2d 1330 (3d Cir. 1992) ("DiTommaso II"), the district court reconsidered the grant of summary judgment with respect to the plaintiff's assertion that the court incorrectly referred to the residual insurance rider to change the meaning of the total disability policy. The court in DiTommaso II noted:

> Plaintiff misunderstands the use of the residual disability rider in interpreting the total disability policy. I referred to the residual disability rider as an example to further support the interpretation I had already made of total disability provisions after considering it in the context of the whole policy. The residual disability rider provides benefits to the plaintiff in the event that he is unable to perform one or more of the duties of his profession. In my decision I pointed out that plaintiff's interpretation of the total disability

> policy would render the residual disability rider ineffective, and is therefore not reasonable.
>
> . . . .
>
> All deposition testimony was carefully considered in my initial determination that the total disability policy was fully integrated, clear and unambiguous.
>
> . . . .
>
> Furthermore, having found the policy to unambiguously require that the plaintiff's injury prevent him from engaging in his regular occupation at the time of his disability, that of an osteopathic physician, none of the statements, . . . viewed in a light most favorable to the plaintiff, show that he is not earning his primary living as an osteopathic physician.

DiTommaso II, 1991 WL 249977, at * 2.

Plaintiff adduced evidence to reflect that in his regular occupation as a cardiothoracic and vascular surgeon he has many duties and he admitted that he continues to practice cardiothoracic and vascular surgery. He performs approximately eighty to ninety percent of his work in vascular surgery, up to ten percent of his work in thoracic surgery and up to ten percent in cardiac surgery, e.g., pacemaker surgery. Prior to the disability diagnosis he performed cardiac surgery as thirty percent of his work, vascular surgery as forty percent of his work, and thoracic surgery as thirty percent of his work. In other words, plaintiff is still functioning and earning his living as a cardiothoracic and vascular surgeon. See Cobosco, 213 A.2d at 373.

Plaintiff's arguments are undermined by plaintiff's applications for malpractice insurance renewals in 2006, 2007 and 2008. On each application, he stated that he performed minor and major surgeries. With respect to major surgeries, he reported in 2008 that he performed cardiac, thoracic and vascular surgeries. His regular occupation was not limited to being an open heart surgeon. He broadly performed the duties of cardiothoracic and vascular surgery.

The policies here define total disability as plaintiff's "inability due to injury or sickness to engage in **the** substantial and material duties of your regular occupation." ((Pl.'s Concise S.F. at

Exs. 1A-B.) (emphasis added.)  Plaintiff's regular occupation is that of a cardiothoracic and vascular surgeon.  (Pl.s Resp. to Mot. 1) (Docket No. 76.)  Plaintiff concedes that he engages in "*some*" cardiothoracic and vascular surgeries.  (Id.)  He argues that because he no longer performs open heart surgeries and complicated vascular surgeries, he no longer performs the material and substantial duties of his regular occupation.  To decide in plaintiff's favor, the court would have to insert the word "all" before the phrase "the substantial and material duties of plaintiff's regular occupation," changing the meaning of the intent of the parties.  This the court cannot do.

Plaintiff's circumstances fit the plain language of the definition for residual disability. The policies define residual disability as:

> your inability due to injury or sickness to perform:
>
> (1) **one or more** of the substantial and material duties of your occupation; or
> 2) the substantial and material duties of your occupation for as much time as is usually required to perform them.

Id.  (emphasis added.)  Here, plaintiff's inability to perform open heart surgeries and complicated vascular surgeries means that he can no longer perform one or more of the substantial and material – or important – duties of his occupation.  In other words, he has a residual disability, as defined in the policies.

Defendant is correct in pointing out that if the court found plaintiff's position to be reasonable, the definition of residual disability would be meaningless.  In other words, to reach the conclusion sought by plaintiff, the court would have to regard the definition of total disability as having the same meaning as residual disability.  The court must view each policy, which includes a residual disability rider, as a whole and cannot find reasonable an interpretation which would render the residual disability definition meaningless.  DiTommaso, 1991 WL 124601, at

*3; see Morgan Smith Auto. Prods., Inc., 210 A.2d at 275; STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS, 2 COUCH ON INSURANCE § 21:19 (3d ed. 2010). "Clauses should not be construed as repugnant unless irreconcilable with any reasonable interpretation which incorporates them as forming a harmonious plan for insurance of the nature contemplated by the parties; rather, the construction must, is possible, give force and affect to each clause." STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS, 2 COUCH ON INSURANCE § 22.44 at 22-189-90 (3d ed. 2010).[20] Under these circumstances, to be totally disabled the plaintiff would need to show he is no longer primarily working as a cardiothoracic or vascular surgeon – his regular occupation. Plaintiff, undisputedly, did not adduce evidence to show total disability.

Viewed in a light most favorable to plaintiff, the record reflects that Klay is still earning his primary living as a cardiothoracic and vascular surgeon. Under those circumstances, there is no genuine issue of material fact in dispute about whether defendant breached its duties to plaintiff under the terms of the policies defining total disability. Summary judgment must be granted in favor of AXA with respect to plaintiff's claims in count II of the amended complaint for breach of contract.

In plaintiff's response to the Motion, he asserts for the first time that defendant also breached the policies by failing to administer properly his residual disability claim, i.e., the onset

---

[20]     The true meaning of the contract must be ascertained from all the provisions in their entirety and not from a literal or technical construction of any isolated or special clauses.

> **Observation:** The terms and conditions of the main insurance contract must be interpreted in light of any riders and endorsements. For example, if the description of the property covered is expanded by an endorsement and this expansion extends the coverage or creates an ambiguity, the two documents must be reconciled.

Further, no phrase should be isolated out of context, for the purpose of creating an ambiguity.

STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS, 2 COUCH ON INSURANCE §22:43 a 22-188-89 (3d ed. 2010).

date of his residual disability should have been July 6, 2006. Plaintiff argues that this claim is subsumed under his claim for breach of contract related to total disability. The court will not address this issue beyond noting that this issue was not raised in the amended complaint and plaintiff will need to seek leave to amend his complaint to assert that claim. See Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57 (3d Cir. 2010) (last minute attempt to amend a pleading for a fourth time; noting tension between Federal Rule of Civil Procedure 15(a)(2) and Federal Rule of Civil Procedure 16(b)(4)); Foman v. Davis, 371 U.S. 178, 182 (1962) (leave to amend pleadings under Rule 15(a) of the Federal Rules of Civil Procedure is generally at the sound discretion of the trial court); see also Rule 16 Case Management Order ¶ 3 (A) ("The parties will need an order of court to amend pleadings . . . . ") (Docket No. 43).

### C.      Count III - Violation of the Covenant of Good Faith and Fair Dealing

A party is generally precluded from maintaining a claim for the breach of the implied duty of good faith and fair dealing separate and distinct from the underlying breach of contract claim. In JHE, Inc. v. SEPTA, No. 1790, 2002 WL 1018941, at *5 (Ct. Com. Pl., Phila. Cnty. May 17, 2002), the court stated:

> [T]he implied covenant of good faith does not allow for a claim separate and distinct from a breach of contract claim. Rather, a claim arising from a breach of the covenant of good faith must be prosecuted as a breach of contract claim, as the covenant does nothing more than imply certain obligations into the contract itself.

Id.; see Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000); In re K-Dur Antitrust Litig., 338 F.Supp.2d 517, 549 (D. N.J. 2004) ("Although Pennsylvania imposes a duty of good faith and fair dealing on each party in the performance of contracts, there is no separate cause of action for breach of these duties under Pennsylvania law."); Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc., 246 F.Supp.2d 394, 400 (E.D. Pa. 2002)

("Pennsylvania law does not recognize a separate claim for breach of implied covenant of good faith and fair dealing."); <u>Commonwealth v. BASF Corp.</u>, No. 3127, 2001 WL 1807788, at *12 (Ct. Com. Pleas, Phila. Cnty. 2001) ("the duty of good faith, whether express or implied in contract, does not create independent substantive rights nor can it override the express contractual terms").

In the instant case, plaintiff concedes that his claim at count III for breach of the implied covenant of good faith and fair dealing sounds in contract and, under Pennsylvania law, is subsumed within the context of his claim at count II for breach of contract and repetitive of his claim at count IV for "bad faith." (Pl.'s Resp. to Mot. 14.) Therefore, defendant's Motion with respect to count III will be granted.

### D.    Violation of the Unfair Claims Settlement and Practices Act

In count IV plaintiff claims that

> [a]t all times material herein, defendant [AXA] was regulated by…40 PA. STAT. §1171.5(10) and 31 PA. CODE §§ 146.1 et. seq., with such frequency as to indicate a general business practice, including, but not limited to, the following acts:
>
>  a) Misrepresenting pertinent facts or insurance policy provisions relating to coverage at issue;
>  b) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
>  c) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
>  d) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed, and;
>  e) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

(Am. Compl. ¶ 29.)  As a direct result of these allegations, plaintiff claims he was damaged and injured because:

> a)  He has suffered emotional distress, annoyance and inconvenience;
> b)  He has suffered additional deterioration of his medical condition;
> c)  He has suffered financially as a result of [AXA]'s failure to timely, fairly and equitably settle Plaintiff Klay's claim, and;
> d)  He has been forced to institute litigation in order to obtain the benefits to which he is entitled under the terms of this [policy].

(Am. Compl. ¶ 30.)

Defendant argues that plaintiff's claims under 40 PA. STAT. § 1171.5(10) ("UIPA") and 31 PA. CODE §§ 146.1 et seq. should be dismissed because neither statute provides a private cause of action; rather, only the insurance commissioner can assert a cause of action under those provisions.  In support, defendant relies upon D'Ambrosio v Pennsylvania National Mutual Casualty Insurance Co., 431 A.2d 966, 969 (Pa. 1981), and Smith v. Nationwide Mutual Fire Insurance Co., 935 F.Supp. 616, 623 (W.D. Pa. 1996).

Plaintiff acknowledged he cannot assert a claim under those provisions.  Defendant's Motion will be granted with respect to plaintiff's claims at count IV for violations of the unfair claims and settlement practices act.  Plaintiff, however, argues he did set forth claims for bad faith under PA. CONS. STAT. § 8371.    See Emp'rs Mut. Cas. Co. v. Loos, 476 F.Supp.2d 478, 493 (W.D. Pa. 2007) ("'[T]he UIPA and the Department of Insurance Regulations can only be enforced by the State Insurance Commissioner and not by way of private action'. . . . [A]a court may look to the language of the UIPA as a guide for determining whether an insurer's conduct constitutes 'bad faith' within the meaning of section 8371.  . . . even though the conduct alleged

to constitute bad faith falls within the purview of acts and practices prohibited by the UIPA." ) (quoting Romano v. Nationwide Mut. Fire Ins. Co., 646 A.2d. 1228 (1994)); see also Boring v. Erie Ins. Group, 641 A.2d 1189, 1190 (Pa. Super. Ct. 1994) (holding that even though appellant's insurance claim had yet to be decided, appellant's bad faith claim was premised upon section 8371, and it constituted a clear and distinct cause of action, therefore, the dismissal of appellant's section 8371 claim was appealable).  Defendant disagrees and argues that plaintiff should not be able to boot-strap his alleged unfair insurance practices act violations into a bad faith claim under 42 PA. CONS. STAT. § 8371 at this juncture.  The court agrees.  Plaintiff's claims filed at count IV will be dismissed without prejudice to allow plaintiff to file a motion seeking to amend his complaint to include a claim for bad faith under Pennsylvania's insurance bad faith statute.

### E.    Count V- Punitive Damages

In count V, plaintiff claims defendant acted willfully or with reckless disregard for the rights of plaintiff or with actual malice, such that punitive damages should be assessed.  "A request for punitive damages is similar to a derivative claim . . . and may properly be characterized as 'a separate but dependent claim for relief' that must be supported by independent allegations and proof."  In re Collins, 233 F.3d 809, 811 (3d Cir. 2000) (quoting 1 James D. Ghiardi, et al., *Punitive Damages L. & Prac.,* § 12.07 at 22-23, 25 (1999)).  Under Pennsylvania law, punitive damages are not recoverable in an action for breach of contract.  See McShea v. City of Phila., 995 A.2d 334 (Pa. 2009); Ash v. Continental Ins. Co., 932 A.2d 877 (Pa. 2007).  Recovery of punitive damages are available under 42 PA. CONS. STAT. § 8371:

> In an action arising under an insurance policy, if the court finds
> that the insurer has acted in bad faith toward the insured, the court
> may take all of the following actions:

>(1) Award interest on the amount of the claim from the date the
>claim was made by the insured in an amount equal to the prime
>rate of interest plus 3%.
>(2) Award punitive damages against the insurer.
>(3) Assess court costs and attorney fees against the insurer.

Section 8371 permits a bad faith claim which is distinct from the underlying contract claim against the insurer. Boring, 641 A.2d at 1190. Here, plaintiff cannot recover punitive damages absent a finding of defendant's violation of Pennsylvania's insurance bad faith statute. Because defendant's Motion will be granted with respect to count IV, the Motion will also be granted with respect to count V for punitive damages; provided, that if plaintiff seeks to amend his complaint to include a claim for bad faith under 42 PA. CONS. STAT. § 8371, he may also seek to include a claim for punitive damages.

## VI.    Conclusion

After a careful review of the submissions of the parties, the court concludes that summary judgment must be **GRANTED** in defendant's favor with prejudice with respect to counts I and III, and without prejudice with respect to counts II, IV, and V. No reasonable jury could render a verdict in plaintiff's favor on any claim asserted in the amended complaint. Plaintiff is granted thirty days to file a motion to amend the amended complaint with respect to counts II, IV, and V to seek to include a claim for breach of contract relating to the administration of his residual disability benefits, a bad faith claim for delay in payment of residual disability benefits and a claim for punitive damages. If plaintiff fails to file a motion to amend the amended complaint within that timeframe, the court will enter judgment in favor of defendant and against plaintiff and the case will be closed. An appropriate order will be entered.

Date:  September 28, 2010                    By the court,

                                             /s/ Joy Flowers Conti
                                            Joy Flowers Conti
                                            United States District Judge